Jason M. Drangel (JD 7204)
jdrangel@ipcounselors.com
Ashly E. Sands (AS 7715)
asands@ipcounselors.com
Brieanne Scully (BS 3711)
bscully@ipcounselors.com
Danielle S. Yamali
dfutterman@ipcounselors.com
EPSTEIN DRANGEL LLP
60 East 42nd Street, Suite 2520
New York, NY 10165
Telephone:     (212) 292-5390
Facsimile:     (212) 292-5391
*Attorneys for Plaintiffs*
*Spin Master Ltd. and Spin Master, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPIN MASTER LTD. and SPIN MASTER, INC., <br><br> *Plaintiffs* <br><br> v. <br><br> ACIPER, ADA TOYZ, AHAHOO, AHIROT, AILA STORE, COLORFULWORLD6, CONTROL FUTURE DIRECT, DEWEER, ELEMUSI, ETCBUYS, FINALBASEDIRECT, FLYGLOBAL, FREE TO FLY, FUNDOM, GOSEAR, GOTECHOD DIRECT, JEICY, JINRONG HE, JJS TOYS, JOYFUN, JOYJAM, JSCOUT, JZD-US, KINGBOT-US, LALAGO, LANKEE, LIBERTY TRADING GB, LYNEE TOYS, MAGNETICSPACE, MAYZO, MI.MENG15, MXTRADE, NAMIGE, NEIL-US, NEW-LOOK, REIMOTKON-US, ROOYA BABY DIRECT, SGILE, SIKAYE TECH INC, SUUKAA, TABPOLE DIRECT, TAIYUANSHIXINGHUALINGQUWANGYAN JUNTIYUYONGPINGDIAN, TOCH DIRECT, TOTOLA TRADING INC, TOY CHEF, TSWA, TULAS, UM-S, UNIDARGON, V-BEST, WALSONTOP, WO FEI, YEYOJOY, YOUDI DIRECT AND YUANBO, <br><br> *Defendants* | CIVIL ACTION No.: **19-cv-6949** <br><br><br> **FIRST AMENDED COMPLAINT** <br><br> **Jury Trial Requested** <br><br> **FILED UNDER SEAL** |

**GLOSSARY**

| Term | Definition |
|------|-----------|
| **Plaintiffs or "Spin Master"** | Spin Master Ltd. and Spin Master, Inc. |
| **Defendants** | ACIPER, Ada Toyz, AHAHOO, AHIROT, AILA Store, Colorfulworld6, Control Future Direct, DEWEER, Elemusi, ETCBUYS, FinalBaseDirect, Flyglobal, Free to Fly, FUNDOM, Gosear, GotechoD Direct, Jeicy, jinrong he, JJs Toys, Joyfun, Joyjam, Jscout, JZD-US, KINGBOT-US, Lalago, lankee, Liberty Trading GB, Lynee toys, Magneticspace, Mayzo, Mi.meng15, MXTRADE, namige, Neil-US, new-look, REIMOTKON-US, ROOYA BABY Direct, SGILE, Sikaye tech Inc, SUUKAA, tabpole Direct, taiyuanshixinghualingquwangyanjuntiyuyongpingdian, Toch Direct, Totola Trading Inc, Toy Chef, TSWA, Tulas, UM-S, UniDargon, V-Best, Walsontop, Wo Fei, YEYOJOY, Youdi Direct and YuanBo |
| **Amazon** | Amazon.com, a Seattle, Washington-based, online marketplace and e-commerce platform owned by Amazon.com, Inc., a Delaware corporation, that allows manufacturers and other third-party merchants, like Defendants, to advertise, distribute, offer for sale, sell and ship their retail products, which, upon information and belief, primarily originate from China, directly to consumers worldwide and specifically to consumers residing in the U.S., including New York |
| **Epstein Drangel** | Epstein Drangel LLP, counsel for Plaintiffs |
| **New York Addresses** | 60 East 42nd Street, Suite 2520, New York, NY 10165; 244 Madison Ave, Suite 411, New York, NY 10016 |
| **Complaint** | Plaintiffs' Complaint filed on July 25, 2019 |
| **First Amended Complaint** | Plaintiffs' First Amended Complaint filed on July 30, 2019 |
| **Application** | Plaintiffs' *Ex Parte* Application for: 1) a temporary restraining order; 2) an order restraining Merchant Storefronts (as defined *infra*) and Defendants' Assets (as defined *infra*) with the Financial Institutions (as defined *infra*); 3) an order to show cause why a preliminary injunction should not issue; 4) an order authorizing bifurcated and alternative service and 5) an order authorizing expedited discovery filed on July 25, 2019 |
| **Harrs Dec.** | Declaration of Christopher Harrs in Support of Plaintiffs' Application |
| **Yamali Dec.** | Declaration of Danielle S. Yamali in Support of Plaintiffs' Application |

i

| | |
|---|---|
| **Spin Master Products** | Innovative children's lifestyle products and toys under Plaintiffs' own well-known brands, including Twisty Petz, Flutterbye Fairy, Bunchems and Hatchimals, as well as under their licensed properties, such as Paw Patrol and Air Hogs |
| **Racer Products** | Plaintiffs' Air Hogs Zero Gravity Laser Racer, which features award-winning patented technology that permits the car to drive along the floor, up the walls, and even upside down |
| **Racer Product Marks** | U.S. Trademark Registration Numbers: 3,267,725 for "WALL CLIMBER" for goods in Class 28, with a constructive date of first use of May 27, 2005; and 3,210,297 for "ZERO GRAVITY" for goods in Class 28, with a constructive date of first use of June 23, 2005 |
| **Counterfeit Products** | Products bearing or used in connection with the Racer Product Marks, and/or products in packaging and/or containing labels and/or hang tags and/or manuals bearing the Racer Product Marks, and/or bearing or used in connection with marks that are confusingly similar to the Racer Product Marks and/or products that are identical or confusingly similar to the Racer Products |
| **Infringing Listings** | Defendants' listings for Counterfeit Products |
| **User Accounts** | Any and all websites and any and all accounts with online marketplace platforms such as Amazon, as well as any and all as yet undiscovered accounts with additional online marketplace platforms held by or associated with Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them |
| **Merchant Storefronts** | Any and all User Accounts through which Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them operate storefronts to manufacture, import, export, advertise, market, promote, distribute, display, offer for sale, sell and/or otherwise deal in Counterfeit Products, which are held by or associated with Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them |
| **Defendants' Assets** | Any and all money, securities or other property or assets of Defendants (whether said assets are located in the U.S. or abroad) |
| **Defendants' Financial Accounts** | Any and all financial accounts associated with or utilized by any Defendants or any Defendants' User Accounts or Merchant Storefront(s) (whether said account is located in the U.S. or abroad) |

| | |
|---|---|
| **Financial Institutions** | Any banks, financial institutions, credit card companies and payment processing agencies, such as Amazon.com, Inc., Amazon Payments, Inc. ("Amazon Pay"), PayPal Inc. ("PayPal"), Payoneer Inc. ("Payoneer"), PingPong Global Solutions, Inc. ("PingPong") and other companies or agencies that engage in the processing or transfer of money and/or real or personal property of Defendants |
| **Third Party Service Providers** | Online marketplace platforms, including, without limitation, those owned and operated, directly or indirectly, by Amazon, such as Amazon.com, as well as any and all as yet undiscovered online marketplace platforms and/or entities through which Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them manufacture, import, export, advertise, market, promote, distribute, offer for sale, sell and/or otherwise deal in Counterfeit Products which are hereinafter identified as a result of any order entered in this action, or otherwise |

Plaintiff Spin Master Ltd., a limited liability company organized in Canada, and Plaintiff Spin Master, Inc., a Delaware corporation and Plaintiff Spin Master Ltd.'s wholly-owned subsidiary and exclusive U.S. licensee, by and through its undersigned counsel, alleges as follows:[1]

## NATURE OF THE ACTION

1.      This action involves claims for trademark infringement of Plaintiffs' federally registered trademarks in violation of § 32 of the Federal Trademark (Lanham) Act, 15 U.S.C. §§ 1051 *et seq.*; counterfeiting of Plaintiffs' federally registered trademarks in violation of 15 U.S.C. §§ 1114(1)(a)-(b), 1116(d) and 1117(b)-(c); false designation of origin, passing off and unfair competition in violation of Section 43(a) of the Trademark Act of 1946, as amended (15 U.S.C. §1125(a)) and related state and common law claims, arising from the infringement of the Racer Product Marks, including, without limitation, the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling unlicensed, counterfeit and infringing versions of Plaintiffs' Racer Products by Defendants.

## JURISDICTION AND VENUE

2.      This Court has federal subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), as well as pursuant to 15 U.S.C. § 1121 as an action arising out of violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*; pursuant to 28 U.S.C. §1338(b) as an action arising out of claims for false designation of origin and unfair competition and pursuant to 28 U.S.C. § 1332, as there is diversity between the parties and the matter in controversy exceeds, exclusive of interests and costs, the sum of

---

[1] Where a defined term is referenced herein but not defined, it should be understood as it is defined in the Glossary.

seventy-five thousand dollars. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§1367(a), as the claims asserted thereunder are so closely related to the federal claims brought in this action as to form part of the same case or controversy.

3.      Personal jurisdiction exists over Defendants in this judicial district pursuant to N.Y.C.P.L.R. § 302(a)(1) and N.Y.C.P.L.R. § 302(a)(3), or in the alternative, Fed. R. Civ. P. 4(k), because, upon information and belief, Defendants regularly conduct, transact and/or solicit business in New York, and/or derive substantial revenue from their business transactions in New York and/or otherwise avail themselves of the privileges and protections of the laws of the State of New York such that this Court's assertion of jurisdiction over Defendants does not offend traditional notions of fair play and due process, and/or Defendants' illegal counterfeiting and infringing actions caused injury to Plaintiffs in New York such that Defendants should reasonably expect such actions to have consequences in New York, for example:

a.   Upon information and belief, Defendants were and/or are systematically directing and/or targeting their business activities at consumers in the U.S., including New York, through User Accounts with online marketplace platforms such as Amazon, as well as any and all as yet undiscovered User Accounts on other online marketplace platforms, through which consumers in the U.S., including New York, can view the one or more Merchant Storefronts that each Defendant operates, uses to communicate with Defendants regarding their listings for Counterfeit Products and to place orders for, receive invoices for and purchase Counterfeit Products for delivery in the U.S., including New York, as a means for establishing regular business with the U.S., including New York.

2

b.  Upon information and belief, Defendants are sophisticated sellers, each operating one or more commercial businesses through their respective User Accounts, using their Merchant Storefronts to manufacture, import, export, advertise, market, promote, distribute, offer for sale, sell and/or otherwise deal in products, including the Counterfeit Products at significantly below-market prices to consumers worldwide, including to consumers in the U.S., and specifically in New York.

c.  Upon information and belief, all Defendants accept payment in U.S. Dollars and offer shipping to the U.S., including to New York and specifically to the New York Address.

d.  Upon information and belief, Defendants have transacted business with consumers located in the U.S., including New York, for the sale and shipment of Counterfeit Products.

e.  Defendants sold, shipped or will ship fifty-four (54) Counterfeit Products to the New York Address.

f.  Upon information and belief, Defendants are aware of Plaintiffs, their Racer Products and Racer Product Marks, and are aware that their illegal counterfeiting and infringing actions alleged herein are likely to cause injury to Plaintiffs in the U.S., in New York and in this judicial district specifically, as Plaintiffs conduct substantial business in New York and have a registered office in New York.

4.  Venue is proper, *inter alia*, pursuant to 28 U.S.C. § 1391 because, upon information and belief, Defendants conduct, transact and/or solicit business in New York.

3

## THE PARTIES

5.    Plaintiff Spin Master Ltd. is a Canadian corporation with a principal place of business at 121 Bloor St. East, Toronto, ON, M4W 1A9, Canada.

6.    Plaintiff Spin Master, Inc. is a Delaware corporation with a registered office at 300 International Drive, Suite 100, Williamsville, New York 14421, and principal place of business at 5880 W. Jefferson Blvd., Suite A, Los Angeles, California 90016.

7.    Upon information and belief, Defendants are merchants on the Amazon.com online marketplace platform, which, upon information and belief, is owned by Amazon.com, Inc., a Delaware corporation with a principal place of business at 410 Terry Avenue North, Seattle, WA 98109 through which Defendants offer for sale and/or sell Counterfeit Products.

## GENERAL ALLEGATIONS

### Plaintiffs and Their Well-Known Racer Products

8.    Plaintiffs are part of a large, multinational toy and entertainment company started in 1994 that designs and sells innovative children's lifestyle products and toys under their own well-known brands, including Twisty Petz, Flutterbye Fairy, Bunchems and Hatchimals, as well as under their licensed properties, such as Paw Patrol and Air Hogs.

9.    Plaintiffs sell their Spin Master Products throughout the U.S. and the world through major retailers, quality toy stores, department stores and online marketplaces, including, but not limited to, Walmart, Toys R Us, Target, Kohl's and Amazon.com.

10.   In addition, Plaintiffs sell their Spin Master Products directly through Plaintiffs' website, available at www.shop.spinmaster.com, as well as through websites dedicated to the individual Spin Master Products.

11.    One of Plaintiffs' lines of successful Spin Master Products is their line of toy products marketed under the brand name "Air Hogs." Specifically, one particular Air Hogs product – the Zero Gravity Laser Racer– is extremely successful. The Racer Product features award-winning patented technology, which permits the car to drive along the floor, up the walls, and even upside down. Images of Plaintiffs' Racer Products are attached hereto as **Exhibit A** and incorporated herein by reference.

12.    The Racer Products generally retail from $32.00 to $35.00.

13.    While Plaintiffs have gained significant common law trademark and other rights in their Racer Products, through use, advertising and promotion, Plaintiffs have also protected their valuable rights by filing for and obtaining federal trademark registrations.

14.    For example, Plaintiffs are the owners of the following U.S. Trademark Registration Numbers: 3,267,725 for "WALL CLIMBER" for goods in Class 28, with a constructive date of first use of May 27, 2005; and 3,210,297 for "ZERO GRAVITY" for goods in Class 28, with a constructive date of first use of June 23, 2005.  True and correct copies of the registrations for the Racer Product Marks are attached hereto as **Exhibit B** and incorporated herein by reference.

15.    The Racer Product Marks, which are incontestable, are in use in commerce in connection with the Racer Products.

16.    Plaintiffs have spent substantial time, money and effort in building up and developing consumer recognition, awareness and goodwill in their Racer Products and Racer Product Marks.

17.    The success of the Racer Products is due in large part to Plaintiffs' marketing, promotion and distribution efforts.  These efforts include, but are not limited to, the advertising and promotion of the Racer Products through Plaintiffs' website entirely dedicated to the Racer

Products, http://www.airhogs.com, nationwide television advertising campaigns for the Racer Products, placement of the Racer Products at dozens of authorized major retail outlets, both domestically and abroad and Plaintiffs' participation in trade shows.

18.  Plaintiffs' success is also due to their use of high quality materials and processes in making the Racer Products.

19.  Additionally, Plaintiffs owe a substantial amount of the success of the Racer Products to their consumers and word-of-mouth buzz that their consumers have generated.

20.  Plaintiffs' efforts, the quality of their Racer Products, their marketing, promotion and distribution efforts as well as the word-of-mouth buzz generated by their consumers have made the Racer Products and Racer Product Marks prominently placed in the minds of the public.  Retailers, retail buyers, consumers and members of the public have become familiar with the Racer Products and associate them exclusively with Plaintiffs.

21.  As a result of such associations, Plaintiffs, and their Racer Product Marks have acquired a valuable reputation and goodwill among the public.

22.  Plaintiffs have gone to great lengths to protect their interests to the Racer Products and Racer Product Marks.  No one other than Plaintiffs and their authorized licensees and distributors are authorized to manufacture, import, export, advertise, offer for sale, or sell any goods utilizing the Racer Product Marks without the express permission of Plaintiffs.

**Amazon and Defendants' User Accounts**

23.  Amazon is an online marketplace and e-commerce platform that allows manufacturers and other third-party merchants, like Defendants, to advertise, distribute, offer for sale, sell and ship their retail products originating primarily from China,[2] among other

---

[2] *See* Juozas Kaziukenas, *Chinese Sellers Are Building Brands on Amazon,* MARKETPLACE PULSE (Dec. 6, 2018), https://www.marketplacepulse.com/articles/chinese-sellers-are-building-brands-on-amazon.

locations, directly to consumers worldwide and specifically to consumers residing in the U.S., including New York.

24.    Amazon is recognized as one of the leaders of the worldwide e-commerce and digital retail market and was projected to generate approximately $258.22 billion in U.S. retail e-commerce sales in 2018, nearly half the U.S. e-commerce market.[3] Sales to the U.S. make up a significant percentage of the business done on Amazon.[4] Currently, Amazon is valued at over $797 billion, which is the largest market value of a public company in the U.S.[5]

25.    Many of the third-party merchants that have User Accounts with and operate Merchant Storefronts on Amazon, like Defendants, are located in China.[6] As of 2018, third-party merchants have sold over $160 billion in merchandise through User Accounts on Amazon.[7] Third-party merchant sales account for half of the volume of all products sold on Amazon.[8]

26.    Amazon aggressively uses the Internet and television, to market itself and the products offered for sale and/or sold by its third-party merchant users to potential consumers, particularly in the U.S. In 2018 alone, Amazon spent approximately $3.4 billion on marketing.[9]

---

[3] *See* eMarketer Editors, *Amazon Now Has Nearly 50% Of Us Ecommerce Market*, EMARKETER.COM (Jul. 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.
[4] *See* Amazon.com, Inc., Annual Report (Form 10-K) (Jan. 31, 2018).
[5] *See* Lauren Feiner, *Amazon is the most valuable public company in the world*, CNBC, https://www.cnbc.com/2019/01/07/amazon-passes-microsoft-market-value-becomes-largest.html/.
[6] *See id.*
[7] *See* Juozas Kaziukenas, *Amazon Gross Merchandise Volume $277 Billion in 2018*, MARKETPLACE PULSE (April 12, 2019), https://www.marketplacepulse.com/articles/amazon-gross-merchandise-volume-277-billion-in-2018.
[8] *See* Parmy Olson, *Meet The Billionaire Who Defied Amazon And Built Wish, The World's Most-Downloaded E-Commerce App*, FORBES (March 13, 2019), https://www.forbes.com/sites/parmyolson/2019/03/13/meet-the-billionaire-who-defied-amazon-and-built-wish-the-worlds-most-downloaded-e-commerce-app/#da45b4d70f52.
[9] *See Amazon: Ad Spend in the U.S. 2017*, STATISTIC, https://www.statista.com/statistics/192254/us-ad-spending-of-amazon/ (last visited Apr. 17, 2019).

27.     As recently addressed in news reports,[10] and as reflected in the federal lawsuits filed against third-party merchants offering for sale and selling infringing and/or counterfeit products on Amazon,[11] an astronomical number of counterfeit and infringing products are offered for sale and sold on Amazon at a rampant rate.[12]

28.     Defendants are individuals and/or businesses, who, upon information and belief, are located in China but conduct business in the U.S. and other countries by means of their User Accounts and on their Merchant Storefronts on Amazon as well as potentially yet undiscovered additional online marketplace platforms.

29.     Through their Merchant Storefronts, Defendants offer for sale and/or sell consumer products, including Counterfeit Products, and target and ship such products to customers located in the U.S., including New York, and throughout the world.

30.     Defendants' Merchant Storefronts share unique identifiers, such as design elements along with similarities in price, description of the goods offered and of the Counterfeit Products themselves offered for sale.

31.     Defendants are in constant communication with each other and regularly participate in online chatroom discussions involving illegal counterfeiting activities, pending litigation and potential new lawsuits.

---

[10] *See* Louise Matsakis, *Amazon Wants Brands to Fight Fake Products Themselves,* WIRED (Mar. 1, 2019), https://www.wired.com/story/amazon-fake-products-project-zero/.
[11] *See, e.g., Apple Inc. v. Mobile Star LLC,* No. C17-1120 RAJ (W.D. Cal. Aug. 4, 2017) and *Diamler AG v. Amazon.com, Inc.*, 16-cv-00518-RSM (W.D. Wash. Mar. 11, 2019).
[12] *See* Steve Brachmann, *Amazon's Counterfeit Problem is a Big One-for Shareholders, Brand Owners and Consumers Alike,* IP WATCHDOG (Feb. 27, 2019), http://www.ipwatchdog.com/2019/02/27/amazons-counterfeit-problem-big-one-for-everyone/id=106710/.

## Defendants' Wrongful and Infringing Conduct

32.  Particularly in light of Plaintiffs' success with their Racer Products, as well as the reputation they have gained, Plaintiffs and their Racer Products have become targets for unscrupulous individuals and entities who wish to capitalize on the goodwill, reputation and fame that Plaintiffs have amassed in their Racer Products and Racer Product Marks and Plaintiffs investigate and enforce against such activities.

33.  Through Plaintiffs' counsel's investigative and enforcement efforts, Plaintiffs learned of Defendants' actions which vary and include, but are not limited to: manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling Counterfeit Products to U.S. consumers, including those located in the state of New York, through Defendants' User Accounts and Merchant Storefronts.  Printouts of Infringing Listings from Defendants' User Accounts and Merchant Storefronts are included in **Exhibit C** attached hereto and incorporated herein by reference.

34.  Defendants are not, and have never been, authorized by Plaintiffs or any of their authorized agents, authorized licensees or authorized distributors to copy, manufacture, import, export, advertise, distribute, offer for sale or sell the Racer Products or to use the Racer Product Marks, or any marks that are confusingly similar to the Racer Product Marks.

35.  Defendants' Counterfeit Products are nearly indistinguishable from Plaintiffs' Racer Products, only with minor variations that no ordinary consumer would recognize.

36.  During their investigation, Plaintiffs, through their counsel, identified Defendants as offering for sale and/or selling Counterfeit Products and completed fifty-four (54) purchases of those Counterfeit Products to one of the New York Addresses. Printouts of the Infringing Listings from Defendants' Merchant Storefronts reflecting that the Defendants ship the

Counterfeit Products to the U.S., Order Confirmation pages and images of the Counterfeit Products received from Defendants are included in **Exhibit C**.

37.   Plaintiffs confirmed that each Defendant was and/or is still currently offering for sale and/or selling Counterfeit Products through their respective User Accounts and/or Merchant Storefronts, accepting payment for such Counterfeit Products in U.S. Dollars through Amazon's own payment processing services and that each Defendant provides shipping and/or has actually shipped Counterfeit Products to the U.S., including to customers located in New York. Plaintiffs' findings are supported by Defendants' Infringing Listings and/or the Order Confirmation pages for Counterfeit Products, which are included in **Exhibit C**.

38.   For example, below on the left is an image of one of Plaintiffs' Racer Products which typically retails from $32.00 - $35.00, and an image of one of Plaintiffs' Racer Product manuals.  Depicted below on the right is the listing for Defendant Ada Toyz's Counterfeit Product ("Ada Toyz Infringing Listing" and "Ada Toyz Counterfeit Product," respectively). The Ada Toyz Infringing Listing appears on Defendant Ada Toyz's Merchant Storefront, https://www.amazon.com/s?me=A17S2H3T272MW6, and offers the Ada Toyz Counterfeit Product for $19.00, using, featuring and/or incorporating one or more of the Racer Product Marks, and/or confusingly similar marks in the listing title, description and/or on the manuals/materials received with the product.  Further, the Ada Toyz Counterfeit Product is virtually identical to one of Plaintiffs' Racer Products and features and/or incorporates one or more of the Racer Product Marks on the Counterfeit Product.  There is no question that the Ada Toyz Counterfeit Product is designed to confuse and mislead consumers into believing that they are purchasing one of Plaintiffs' Racer Products or that the Ada Toyz Counterfeit Product is otherwise approved by or sourced from Plaintiffs, thereby trading off of the goodwill and

reputation of Plaintiffs by engaging in the unauthorized use of one or more of the Racer Product

Marks:



**Racer Product**                                   **Defendant's Counterfeit Product**

                                   

                                   

39.   As another example, below on the left is an image of one of Plaintiffs' Racer

Products, which typically retails from $32.00 - $35.00, and an image of one of Plaintiffs' Racer

Product manuals.  Depicted below on the right is the listing for Defendant Lalago's Counterfeit

Product ("Lalago Infringing Listing" and "Lalago Counterfeit Product," respectively).  The

Lalago  Infringing  Listing  appears  on  Defendant  Lalago's  Merchant  Storefront,

https://www.amazon.com/s?me=AWDWYDI09TIZM,  and  offers  the  Lalago  Counterfeit

Product for $26.99 per item, using, featuring and/or incorporating one or more of the Racer

Product Marks, and/or a confusingly similar marks in the listing title, description and/or on the

manuals/materials received with the product. Further, the Lalago Counterfeit Product is virtually

identical to one of Plaintiffs' Racer Products and features and/or incorporates one or more of

the Racer Product Marks on the Counterfeit Product.  There is no question that the Lalago

Counterfeit Product is designed to confuse and mislead consumers into believing that they are

purchasing one of the Racer Products or that the Lalago Counterfeit Product is otherwise

approved by or sourced from Plaintiffs, thereby trading off of the goodwill and reputation of Plaintiffs by engaging in the unauthorized use of one or more of the Racer Product Marks:

**Racer Product**                    **Defendant's Counterfeit Product**

    

    

40. By way of another example, below on the left is an image of one of Plaintiffs' Racer Products, which typically retails from $32.00 - $35.00, and an image of one of Plaintiffs' Racer Product manuals. Depicted below on the right is a listing for Defendant Lynee Toys's Counterfeit Product ("Lynee Toys Infringing Listing" and "Lynee Toys Counterfeit Product," respectively). The Lynee Toys Infringing Listing appears on Defendant Lynee Toys's Merchant Storefront, https://www.amazon.com/s?me=A1VZRA5FUKV61, and offers the Lynee Toys Counterfeit Product for $26.99, using, featuring and/or incorporating one or more of the Racer Product Marks, and/or confusingly similar marks in the listing title, description and/or on the manuals/materials received with the product. Further, the Lynee Toys Counterfeit Product is virtually identical to one of Plaintiffs' Racer Products and features and/or incorporates one or more of the Racer Product Marks on the Counterfeit Product. There is no question that the Lynee Toys Counterfeit Product is designed to confuse and mislead consumers into believing

12

that they are purchasing one of Plaintiffs' Racer Products or that the Lynee Toys Counterfeit

Product is otherwise approved by or sourced from Plaintiffs, thereby trading off of the goodwill

and reputation of Plaintiffs by engaging in the unauthorized use of one or more of the Racer

Product Marks:

| **Racer Product** | **Defendant's Counterfeit Product** |
|---|---|
|   |  |

41.    By these dealings in Counterfeit Products (including, without limitation, copying,

manufacturing, importing, exporting, advertising, marketing, promoting, distributing,

displaying, offering for sale and/or selling Counterfeit Products), Defendants violated Plaintiffs'

exclusive rights in the Racer Product Marks, and have used marks and images that are

confusingly similar to, identical to and/or constitute counterfeiting and/or infringement of the

Racer Product Marks in order to confuse consumers into believing that such Counterfeit

Products are Racer Products and aid in the promotion and sales of their Counterfeit Products.

Defendants' conduct began long after Plaintiffs' adoption and use of the Racer Product Marks,

after Plaintiffs obtained the federal registrations in the Racer Product Marks, as alleged above,

and after Plaintiffs' Racer Products and Racer Product Marks became well-known to the

purchasing public.

13

42.   Prior to and contemporaneous with their counterfeiting and infringing actions alleged herein, Defendants had knowledge of Plaintiffs' ownership of the Racer Product Marks, of the fame and incalculable goodwill associated therewith and of the popularity and success of the Racer Products, and in bad faith adopted the Racer Product Marks.

43.   Defendants have been engaging in the illegal counterfeiting and infringing actions, as alleged herein, knowingly and intentionally, or with reckless disregard or willful blindness to Plaintiffs' rights, or in bad faith, for the purpose of trading on the goodwill and reputation of Plaintiffs, the Racer Product Marks and Racer Products.

44.   Defendants' dealings in Counterfeit Products, as alleged herein, has caused, and will continue to cause confusion, mistake, economic loss, and have deceived and will continue to deceive consumers, the public and the trade with respect to the source or origin of Defendants' Counterfeit Products, thereby causing consumers to erroneously believe that such Counterfeit Products are licensed by or otherwise associated with Plaintiffs, thereby damaging Plaintiffs.

45.   By engaging in these actions, Defendants have, jointly and severally, among other things, willfully and in bad faith committed the following, all of which have and will continue to cause irreparable harm to Plaintiffs: infringed and counterfeited the Racer Product Marks, committed unfair competition and unfairly and unjustly profited from such activities at Plaintiffs' expense.

46.   Unless enjoined, Defendants will continue to cause irreparable harm to Plaintiffs.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Trademark Counterfeiting)
**[15 U.S.C. § 1114(1)(b)/Lanham Act § 32; 15 U.S.C. § 1116(d)/Lanham Act § 34; 15 U.S.C. § 1117(b)-(c)/Lanham Act § 35]**

47.   Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

48.   Plaintiffs are the exclusive owner of all right and title to the Racer Product Marks.

49.   Plaintiffs have continuously used the Racer Product Marks in interstate commerce since on or before the date of first use as reflected in the registrations attached hereto as **Exhibit B**.

50.   Without Plaintiffs' authorization or consent, with knowledge of Plaintiffs' well-known and prior rights in their Racer Product Marks and with knowledge that Defendants' Counterfeit Products bear counterfeit marks, Defendants intentionally reproduced, copied and/or colorably imitated the Racer Product Marks and/or used spurious designations that are identical with, or substantially indistinguishable from, the Racer Product Marks on or in connection with the manufacturing, import, export, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products.

51.   Defendants have manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale and/or sold their Counterfeit Products to the purchasing public in direct competition with Plaintiffs, in or affecting interstate commerce, and/or have acted with reckless disregard of Plaintiffs' rights in and to the Racer Product Marks through their participation in such activities.

52.   Defendants have applied their reproductions, counterfeits, copies and colorable imitations of the Racer Marks to packaging, point-of-purchase materials, promotions and/or

15

advertisements intended to be used in commerce upon, or in connection with the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling of Defendants' Counterfeit Products, which is likely to cause confusion, mistake, and deception among the general purchasing public as to the origin of the Counterfeit Products, and is likely to deceive consumers, the public and the trade into believing that the Counterfeit Products sold by Defendants originate from, are associated with or are otherwise authorized by Plaintiffs, thereby making substantial profits and gains to which they are not entitled in law or equity.

53.   Defendants' unauthorized use of the Racer Product Marks on or in connection with the Counterfeit Products was done with notice and full knowledge that such use was not authorized or licensed by Plaintiffs or their authorized agents and with deliberate intent to unfairly benefit from the incalculable goodwill inherent in the Racer Product Marks.

54.   Defendants' actions constitute willful counterfeiting of the Racer Product Marks in violation of 15 U.S.C. §§ 1114(1)(a)-(b), 1116(d) and 1117(b)-(c).

55.   As a direct and proximate result of Defendants' illegal actions alleged herein, Defendants have caused substantial monetary loss and irreparable injury and damage to Plaintiffs, their business, their reputation and their valuable rights in and to the Racer Product Marks and the goodwill associated therewith, in an amount as yet unknown, but to be determined at trial, for which Plaintiffs have no adequate remedy at law, and unless immediately enjoined, Defendants will continue to cause such substantial and irreparable injury, loss and damage to Plaintiffs and their valuable Racer Product Marks.

56.   Based on Defendants' actions as alleged herein, Plaintiffs are entitled to injunctive relief, damages for the irreparable harm that Plaintiffs have sustained, and will sustain, as a

result of Defendants' unlawful and infringing actions, as alleged herein, and all gains, profits and advantages obtained by Defendants as a result thereof, enhanced discretionary damages, treble damages and/or statutory damages of up to $2,000,000 per counterfeit mark per type of goods sold, offered for sale or distributed and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### (Infringement of Registered Trademark)
### [115 U.S.C. § 1114/Lanham Act § 32(a)]

57.  Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

58.  Plaintiffs have continuously used the Racer Product Marks in interstate commerce since on or before the date of first use as reflected in the registration certificate attached hereto as **Exhibit B**.

59.  Plaintiffs, as owners of all right, title and interest in and to the Racer Product Marks, have standing to maintain an action for trademark infringement under 15 U.S.C. § 1114.

60.  Defendants were, at the time they engaged in their actions as alleged herein, actually aware that Plaintiffs are the owner of the federal trademark registrations for the Racer Product Marks.

61.  Defendants did not seek and thus inherently failed to obtain consent or authorization from Plaintiffs, as the registered trademark owner of the Racer Product Marks, to deal in and commercially manufacture, import, export, advertise, market, promote, distribute, display, retail, offer for sale and/or sell Racer Products and/or related products bearing the Racer Product Marks into the stream of commerce.

62.  Defendants knowingly and intentionally manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale and/or sold Counterfeit

17

Products, bearing and/or utilizing marks that are reproductions, counterfeits, copies and/or colorable imitations of the Racer Product Marks and/or which are identical or confusingly similar to the Racer Product Marks.

63.    Defendants knowingly and intentionally reproduced, copied and colorably imitated the Racer Product Marks and applied such reproductions, copies or colorable imitations to packaging, wrappers, receptacles, online listings and/or advertisements used in commerce upon, or in connection with the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or sale of Defendants' Counterfeit Products.

64.    Defendants were, at the time they engaged in their illegal and infringing actions as alleged herein, actually aware that Plaintiffs are the owner of all rights in and to the Racer Product Marks.

65.    Defendants' egregious and intentional use of the Racer Product Marks in commerce on or in connection with Defendants' Counterfeit Products has caused, and is likely to continue to cause, actual confusion and mistake, and has deceived, and is likely to continue to deceive, the general purchasing public as to the source or origin of the Counterfeit Products, and is likely to deceive the public into believing that Defendants' Counterfeit Products are the Racer Products or are otherwise associated with, or authorized by, Plaintiffs.

66.    Defendants' actions have been deliberate and committed with knowledge of Plaintiffs' rights and goodwill in the Racer Product Marks, as well as with bad faith and the intent to cause confusion, mistake and deception.

67.    Defendants' continued, knowing, and intentional use of the Racer Product Marks without Plaintiffs' consent or authorization constitutes intentional infringement of Plaintiffs'

federally registered Racer Product Marks in violation of §32 of the Lanham Act, 15 U.S.C. § 1114.

68.   As a direct and proximate result of Defendants' illegal and infringing actions as alleged herein, Plaintiffs have suffered substantial monetary loss and irreparable injury, loss and damage to their business and their valuable rights in and to the Racer Product Marks and the goodwill associated therewith in an amount as yet unknown, but to be determined at trial, for which Plaintiffs have no adequate remedy at law, and unless immediately enjoined, Defendants will continue to cause such substantial and irreparable injury, loss and damage to Plaintiffs and the valuable Racer Product Marks.

69.   Based on Defendants' actions as alleged herein, Plaintiffs are entitled to injunctive relief, damages for the irreparable harm that Plaintiffs have sustained, and will sustain, as a result of Defendants' unlawful and infringing actions as alleged herein, and all gains, profits and advantages obtained by Defendants as a result thereof, enhanced discretionary damages, as well as other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, and reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**(False Designation of Origin, Passing Off & Unfair Competition)**
**[15 U.S.C. § 1125(a)/Lanham Act § 43(a)]**

70.   Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

71.   Plaintiffs, as the owner of all right, title and interest in and to the Racer Product Marks, have standing to maintain an action for false designation of origin and unfair competition under the Federal Trademark Statute, Lanham Act § 43(a) (15 U.S.C. § 1125).

72. The Racer Product Marks are inherently distinctive and/or have acquired distinctiveness.

73. Defendants knowingly and willfully used in commerce products and/or packaging designs that are identical or confusingly or substantially similar to, and constitute reproductions of the Racer Product Marks and affixed, applied and used false designations of origin and false and misleading descriptions and representations on or in connection with the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or sale of Counterfeit Products with the intent to cause confusion, to cause mistake and to deceive the purchasing public into believing, in error, that Defendants' substandard Counterfeit Products are Racer Products or related products, and/or that Defendants' Counterfeit Products are authorized, sponsored, approved, endorsed or licensed by Plaintiffs and/or that Defendants are affiliated, connected or associated with Plaintiffs, thereby creating a likelihood of confusion by consumers as to the source of such Counterfeit Products, and allowing Defendants to capitalize on the goodwill associated with, and the consumer recognition of, the Racer Product Marks, to Defendants' substantial profit in blatant disregard of Plaintiffs' rights.

74. By manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products that are identical to, confusingly similar to or which constitute colorable imitations of the Racer Products using marks that are identical and/or confusingly or similar to, or which constitute colorable imitations of the Racer Product Marks, Defendants have traded off the extensive goodwill of Plaintiffs and their Racer Products and did in fact induce, and intend to, and will continue to induce customers to purchase Defendants' Counterfeit Products, thereby directly and unfairly competing with Plaintiffs. Such conduct has permitted and will continue

to permit Defendants to make substantial sales and profits based on the goodwill and reputation of Plaintiffs and their Racer Product Marks, which Plaintiffs have amassed through their nationwide marketing, advertising, sales and consumer recognition.

75. Defendants knew, or by the exercise of reasonable care should have known, that their adoption and commencement of and continuing use in commerce of marks that are identical or confusingly or substantially similar to and constitute reproductions of the Racer Product Marks would cause confusion, mistake or deception among purchasers, users and the public.

76. Upon information and belief, Defendants' aforementioned wrongful actions have been knowing, deliberate, willful, intended to cause confusion, to cause mistake and to deceive the purchasing public and with the intent to trade on the goodwill and reputation Plaintiffs, their Racer Products and Racer Product Marks.

77. As a direct and proximate result of Defendants' aforementioned actions, Defendants have caused irreparable injury to Plaintiffs by depriving Plaintiffs of sales of their Racer Products and by depriving Plaintiffs of the value of their Racer Product Marks as commercial assets in an amount as yet unknown, but to be determined at trial, for which it has no adequate remedy at law, and unless immediately restrained, Defendants will continue to cause substantial and irreparable injury to Plaintiffs and the goodwill and reputation associated with the value of Racer Product Marks.

78. Based on Defendants' wrongful conduct, Plaintiffs are entitled to injunctive relief as well as monetary damages and other remedies as provided by the Lanham Act, including damages that Plaintiffs have sustained and will sustain as a result of Defendants' illegal and infringing actions as alleged herein, and all gains, profits and advantages obtained by

Defendants as a result thereof, enhanced discretionary damages and reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
### (Unfair Competition)
### [New York Common Law]

79.   Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

80.   By manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products, Defendants have traded off the extensive goodwill of Plaintiffs and their Racer Products to induce, and did induce and intend and will continue to induce, customers to purchase their Counterfeit Products, thereby directly competing with Plaintiffs.   Such conduct has permitted and will continue to permit Defendants to make substantial sales and profits based on the goodwill and reputation of Plaintiffs, which Plaintiffs have amassed through their nationwide marketing, advertising, sales and consumer recognition.

81.   Defendants' advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products was and is in violation and derogation of Plaintiffs' rights and is likely to cause confusion and mistake, and to deceive consumers and the public as to the source, origin, sponsorship or quality of Defendants' Counterfeit Products.

82.   Defendants knew, or by the exercise of reasonable care should have known, that their advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products and their continuing advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the

Counterfeit Products would cause confusion and mistake, or deceive purchasers, users and the public.

83.   Upon information and belief, Defendants' aforementioned wrongful actions have been knowing, deliberate, willful, intended to cause confusion and mistake, and to deceive, in blatant disregard of Plaintiffs' rights, and for the wrongful purpose of injuring Plaintiffs, and their competitive position while benefiting Defendants.

84.   As a direct and proximate result of Defendants' aforementioned wrongful actions, Plaintiffs have been and will continue to be deprived of substantial sales of their Racer Products in an amount as yet unknown but to be determined at trial, for which Plaintiffs have no adequate remedy at law, and Plaintiffs have been and will continue to be deprived of the value of the Racer Product Marks as commercial assets in an amount as yet unknown but to be determined at trial, for which Plaintiffs have no adequate remedy at law.

85.   As a result of Defendants' actions alleged herein, Plaintiffs are entitled to injunctive relief, an order granting Plaintiffs' damages and Defendants' profits stemming from their infringing activities, and exemplary or punitive damages for Defendants' intentional misconduct.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)
### [New York Common Law]

86.   Plaintiffs replead and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

87.   By virtue of the egregious and illegal acts of Defendants as described herein, Defendants have been unjustly enriched in an amount to be proven at trial.

88.   Defendants' retention of monies gained through their deceptive business practices, infringement, acts of deceit and otherwise would serve to unjustly enrich Defendants and would be contrary to the interests of justice.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, inclusive, and each of them, as follows:

A.   For an award of Defendants' profits and Plaintiffs' damages pursuant to 15 U.S.C. § 1117(a), enhanced discretionary damages under 15 U.S.C. § 1117(a)(3) and treble damages in the amount of a sum equal to three (3) times such profits or damages, whichever is greater, pursuant to 15 U.S.C. § 1117(b) for willfully and intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark in violation of 15 U.S.C. § 1114(1)(a);

B.   In the alternative to Defendants' profits and Plaintiffs' actual damages, enhanced discretionary damages and treble damages for willful use of a counterfeit mark in connection with the sale, offering for sale or distribution of goods or services, for statutory damages pursuant to 15 U.S.C. § 1117(c) in the amount of not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale or distributed, as the Court considers just, which Plaintiffs may elect prior to the rendering of final judgment;

C.   For an award of Defendants' profits and Plaintiffs' damages in an amount to be proven at trial for willful trademark infringement of Plaintiffs' federally registered Racer Product Marks, and such other compensatory damages as the Court determines to be fair and appropriate pursuant to 15 U.S.C. § 1117(a);

D.      For an award of Defendants' profits and Plaintiffs' damages pursuant to 15 U.S.C. § 1117(a) in an amount to be proven at trial and such other compensatory damages as the Court determines to be fair and appropriate pursuant to 15 U.S.C. § 1117(a) for false designation of origin and unfair competition under 15 U.S.C. §1125(a);

E.      For an award of damages to be proven at trial for common law unfair competition;

F.      For an award of damages in an amount to be proven at trial for unjust enrichment;

G.      For a preliminary and permanent injunction by this Court enjoining and prohibiting Defendants, or their agents, and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns and entities owned or controlled by Defendants, and all those in active concert or participation with Defendants, and each of them who receives notice directly or otherwise of such injunction from:

      i.   manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products;

      ii.  directly or indirectly infringing in any manner any of Plaintiffs' Racer Product Marks;

      iii. using any reproduction, counterfeit, copy or colorable imitation of Plaintiffs' Racer Product Marks, to identify any goods or services not authorized by Plaintiffs;

      iv. using any of Plaintiffs' Racer Product Marks, or any other marks that are confusingly similar to the Racer Product Marks, on or in connection with Defendants' manufacturing, importing, exporting, advertising, marketing,

promoting, distributing, displaying, offering for sale, selling and/or otherwise dealing in the Counterfeit Products;

v.   using any false designation of origin or false description, or engaging in any action which is likely to cause confusion, cause mistake and/or to deceive members of the trade and/or the public as to the affiliation, connection or association of any product manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale or sold by Defendants with Plaintiffs, and/or as to the origin, sponsorship or approval of any product manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale or sold by Defendants and Defendants' commercial activities by Plaintiffs;

vi.   engaging in the unlawful, unfair or fraudulent business acts or practices, including, without limitation, the actions described herein, including the of advertising and/or dealing in any Counterfeit Products;

vii.   engaging in any other actions that constitute unfair competition with Plaintiffs;

viii.   engaging in any other act in derogation of Plaintiffs' rights;

ix.   from secreting, concealing, destroying, altering, selling off, transferring or otherwise disposing of and/or dealing with: (i) Counterfeit Products; (ii) any computer files, data, business records, documents or any other records or evidence relating to Defendants' User Accounts or Merchant Storefronts, Defendants' Assets from or to Defendants' Financial Accounts and the

> manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products;
>
> x.   from secreting, concealing, transferring, disposing of, withdrawing, encumbering or paying any of Defendants' Assets from or Defendants' Financial Accounts until further ordered by this Court;
>
> xi.   effecting assignments or transfers, forming new entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in any Final Judgment or Order in this action;
>
> xii.   providing services to Defendants, Defendants' User Accounts and Defendants' Merchant Storefronts, including, without limitation, continued operation of Defendants' User Accounts and Merchant Storefronts; and
>
> xiii.   instructing, assisting, aiding or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (xii) above; and

H.   For an order of the Court requiring that Defendants recall from any distributors and retailers and deliver up to Plaintiffs for destruction any and all Counterfeit Products and any and all packaging, labels, tags, advertising and promotional materials and any other materials in the possession, custody or control of such distributors and retailers that infringe any of Plaintiffs' trademarks, copyrights or other rights including, without limitation, the Racer Product Marks, or bear any marks that are confusingly similar to the Racer Product Marks;

I.      For an order of the Court requiring that Defendants deliver up for destruction to Plaintiffs any and all Counterfeit Products and any and all packaging, labels, tags, advertising and promotional materials and any other materials in the possession, custody or control of Defendants that infringe any of Plaintiffs' Racer Product Marks, or bear any marks that are confusingly similar to the Racer Product Marks pursuant to 15 U.S.C. § 1118;

J.      For an order from the Court requiring that Defendants provide complete accountings for any and all monies, profits, gains and advantages derived by Defendants from their manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, sale and/or otherwise dealing in the Counterfeit Products as described herein, including prejudgment interest;

K.      For an order from the Court that an asset freeze or constructive trust be imposed over any and all monies, profits, gains and advantages in Defendants' possession which rightfully belong to Plaintiffs;

L.      For an award of exemplary or punitive damages in an amount to be determined by the Court;

M.      For Plaintiffs' reasonable attorneys' fees;

N.      For all costs of suit; and

O.      For such other and further relief as the Court may deem just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all claims.

Dated: July 30, 2019                     Respectfully submitted,

                                         EPSTEIN DRANGEL LLP

                                         BY:

                                             Danielle S. Yamali (DY 4228)
                                             dfutterman@ipcounselors.com
                                             Jason M. Drangel (JD 7204)
                                             jdrangel@ipcounselors.com
                                             Ashly E. Sands (AS 7715)
                                             asands@ipcounselors.com
                                             Brieanne Scully (BS 3711)
                                             bscully@ipcounselors.com
                                             60 East 42nd Street, Suite 2520
                                             New York, NY 10165
                                             Telephone:    (212) 292-5390
                                             Facsimile:    (212) 292-5391
                                             *Attorneys for Plaintiffs*
                                             *Spin Master Ltd. and Spin Master, Inc.*

29

# EXHIBIT A

## AUTHENTIC RACER PRODUCT, BLUE











## DRIVING ON WALLS OR UPSIDE DOWN



To drive on walls and upside down, you must have switch positioned to the left.
NOTE: Avoid driving overhead when other people are around.
Do not stand underneath when driving overhead.

## DRIVING ON THE GROUND



To drive on the ground you must have the switch positioned in the middle. The fan will not turn ON, but the green light on top of vehicle will turn on and will drive properly on the ground. (The ground mode saves the battery charge.)

## DRIVING ON WALLS OR UPSIDE DOWN



The fabric air skirts can be adjusted outward at a 45° angle to ensure proper wall suction.
IMPORTANT: The Zero Gravity™ Laser should only be driven on smooth, clean, flat surfaces. Dirt or debris can get inside the fan and cause damage.

## DRIVING SEQUENCE



Turn the controller "ON".



Pull the trigger on controller to emit a beam, point the beam at the wall or ground in front of car.



The car will chase the beam from controller, as you move the beam across the wall or ground.

When finished with your Zero Gravity™ Laser Wall Climber, remove vehicle from wall.
Turn vehicle OFF. Turn the controller OFF.

6

100%

The Zero Gravity™ Laser Wall Climber has a working LED light on the top of the car.

10%

IMPORTANT: When the LED begins to blink, the battery is running low on power. Car should be removed from the wall immediately. Otherwise the vehicle may fall off the wall.

| TROUBLESHOOTING | |
|---|---|
| PROBLEM | SOLUTION |
| Vehicle will not run. | 1. Power switch is off. Turn on.<br>2. Controller battery is installed with incorrect polarity. Check (+) and (-) markings to make sure the battery is properly aligned.<br>3. Batteries are drained. Install new batteries. |
| Vehicle does not climb walls. | 1. Turn vehicle off for 50 seconds then restart.<br>2. Suction is jammed. Remove debris by blowing gently on the fan area located on the bottom of the vehicle. |
| Vehicle does not drive well. | 1. Make sure surface is clean of dirt/dust.<br>2. Make sure surface is neither too rough or too smooth.<br>3. Make sure surface is flat. |
| Vehicle slips climbing walls. | 1. Clean the tires with a damp rag.<br>2. Fold up the fabric skirts for a better seal prior to use. |
| Vehicle falls off the wall. | 1. Make sure to discharge and then charge again for 50 to 50 minutes.<br>2. Clean tires and make sure your wall and floor are also clean.<br>3. Check the fabric skirts for damage. If they have been pulled loose, tape them back on with flexible tape.<br>4. Make sure surface is flat. |

**NOTE:** If normal function of the product is disturbed or interrupted, strong electro-magnetic interference may be causing the issue. To reset product, turn it completely off, then turn it back on. If normal operation does not resume, move the product to another location and try again. To ensure normal performance, change the batteries, as low batteries may not allow full function.

FC This product complies with Part 15 of the FCC rules. Operation is subject to the following two conditions: (1) This device may not cause harmful interference, and (2) This device must accept any interference received, including interference that may cause undesirable operation. This equipment has been tested and found to comply with the limits for Class B digital devices pursuant to Part 15 of the FCC rules. These limits are designed to provide reasonable protection against harmful interference to radio communications. Because this toy generates, uses, and can radiate radio frequency energy, there can be no guarantee that interference will not occur. If this toy does cause interference to radio or television reception you can check this by turning the toy off and on while listening for the interference), one or more of the following measures may be useful. • Reorient or relocate the receiving antenna • increase the separation between the toy and the radio or the TV • Consult the dealer or an experienced TV-radio technician for help. NOTE: Changes, adjustments or modifications to this unit, including but not limited to: replacement of any transmitter component (crystal, semiconductor, etc.) could result in a violation of FCC rules under part 15 and/or 95 and must be expressly approved by Spin Master Ltd. or they could void the user's authority to operate the equipment.

CANADIAN Class B statement: This class B digits apparatus meets all the requirements of the Canadian Interference-Causing Equipment Regulations.

**BATTERY SAFETY INFORMATION:**
• Requires six AA 1.5-V alkaline batteries (not Included).
• Batteries are small objects.
• Replacement of batteries must be done by adults.
• Follow the polarity (+/-) diagram in the battery compartment.
• Promptly remove dead batteries from the toy.
• Dispose of used batteries properly.
• Remove batteries for prolonged storage
• DO NOT incinerate used batteries.
• DO NOT dispose of batteries in fire, as batteries may explode or leak.
• DO NOT mix old and new batteries or types of batteries (i.e. alkaline/standard).
• DO NOT use rechargeable batteries.
• DO NOT recharge non-rechargeable batteries.
• DO NOT short-circuit the supply terminals.

Your Zero Gravity™ Laser is equipped with a Lithium Polymer battery.
**SPECIAL LIPO BATTERY INSTRUCTIONS:**
• Never charge battery unattended.
• Charge battery in isolated area. Keep away from flammable materials.
• Do not expose to direct sunlight.
• There is a risk of the batteries exploding, overheating, or igniting. Do not disassemble, modify, heat, or short circuit the batteries. Do not place them in fires or leave them in hot places.
• Do not drop or subject to strong impacts.
• Do not allow the batteries to get wet.

• Only charge the batteries with the specified Spin Master™ battery charger.
• Only use the batteries in the device specified by Spin Master™.
• Carefully read the instruction guide, and use the batteries correctly.
• In the unlikely event of leakage or explosion use sand or a chemical fire extinguisher for the battery.
• Batteries must be recycled or disposed of property.

⚠ WARNING:
Do not point the LED light at eyes. It is rare but possible for seizures to be triggered by light flashes. To reduce exposure to such potential, do not flash lights directly into eyes.

 Contains LiPo battery pack • Battery pack must be recycled or disposed of properly. • If at any time in the future you should need to dispose of this product please note that Waste Electrical Products should NOT be disposed of with household waste. Please recycle where facilities exist. Check with your Local Authority or retailer for recycling advice. (Waste Electrical and Electronict Equipment Directive).

SPIN MASTER LTD., 450 FRONT STREET WEST, TORONTO, ON M5V 1B6 CANADA
Customer Care: 1-800-622-8200  Fax: 416-364-8005
Email: customercare@spinmaster.com
Spin Master Inc., PMB #10362, 300 International Drive, Suite 100, Williamsville, NY 14221, USA
Spin Master Toys Far East Limited, Rm #1113, 11/F, Chinachem Golden Plaza, 77 Mody Rd., Tsimshatsui E., Kowloon, HK

Imported by:
SPIN MASTER INTERNATIONAL S.A.R.L., 18 AVENUE PASTEUR L-2310, LUXEMBOURG
www.spinmaster.com

  ⚠ Warning! Choking Hazard – Small Parts.   CE

Air Hogs™, related trademarks & © 2011 Spin Master Ltd. All rights reserved. This product conforms to safety requirements of ASTM F963, EN71 & CHPA. • Please retain this information for future reference. • Please remove all packaging materials before giving to children. • An adult should periodically check this toy to ensure no damage or hazards are found. If so, remove from use. • Children should be supervised during play. • Keep addresses and phone numbers for future reference. • The item inside this package may vary from the photographs and/or illustrations.
MADE IN CHINA.

20039309_20028010_20039311_20039312  GML English  REV 0
T14066_0008_20038009_GML_IS_R1



8

# AUTHENTIC RACER PRODUCT, RED











**AIR HOGS R/C**

**ZERO GRAVITY LASER**

**NOTE:** USE ON SMOOTH, CLEAN SURFACES ONLY! FOR INDOOR USE ONLY. ADULT SUPERVISION RECOMMENDED!

**10-12 yrs ADVANCED**

### INSTRUCTION GUIDE

TO GET THE MOST OUT OF YOUR ZERO GRAVITY™ LASER WALL RACER PLEASE READ THESE INSTRUCTIONS FIRST!

Check to make sure contents are complete:
- 1 Zero Gravity™ Laser Wall Racer
- 1 Controller/Charger
- 1 Instruction Guide

Zero Gravity™ Laser Wall Racer

Controller/Charger

### BATTERY INSTALLATION

**CONTROLLER/CHARGER**

Battery Compartment

Six 1.5-V AA Alkaline Batteries

Battery Compartment Door

1. Open the battery door with a screwdriver.
2. If used batteries are present, remove these batteries from the unit by pulling up on one end of each battery.
3. Install new batteries as shown in the polarity diagram (+/-) inside the battery compartment.
4. Replace battery door securely.
5. Check your local laws and regulations for correct recycling and/or battery disposal.

### CHARGING YOUR ZERO GRAVITY™ LASER

1. Switch car to "OFF". ☐ OFF

2. Switch controller/charger to "OFF". CHARGE OFF ON

3. Take out charger plug and plug into car.

4. Slide the switch to the "Charge" position on the controller. CHARGE OFF ON

5. Red light flashing: Vehicle is charging.

Green & Red light flashing together: Vehicle is charged.

Green & Red light flashing alternatively: error.

Green light flashing/Red light off: Replace AA Batteries.

Red LED   Green LED

6. When charged, turn controller/charger switch to "OFF". CHARGE OFF ON

- Charging should take between 30 and 50 minutes depending on how much charge is left in the car.
- **NOTE:** Do not charge battery immediately after use. Let the car battery cool for at least 10 minutes. If charging is not complete in 50 minutes, replace the charger batteries.
Your Wall Climber has a pre-installed rechargeable battery inside the vehicle body. (Rechargeable battery is not replaceable.)

13

## DRIVING ON WALLS OR UPSIDE DOWN



To drive on walls and upside down, you must have switch positioned to the left.
NOTE: Avoid driving overhead when other people are around.
Do not stand underneath when driving overhead.

## DRIVING ON THE GROUND



To drive on the ground you must have the switch positioned in the middle. The fan will not turn ON, but the green light on top of vehicle will turn on and will drive properly on the ground. (The ground mode saves the battery charge.)

## DRIVING ON WALLS OR UPSIDE DOWN



The fabric air skirts can be adjusted outward at a 45° angle to ensure proper wall suction.
IMPORTANT: The Zero Gravity™ Laser should only be driven on smooth, clean, flat surfaces. Dirt or debris can get inside the fan and cause damage.

## DRIVING SEQUENCE



Turn the controller "ON".



Pull the trigger on controller to emit a beam, point the beam at the wall or ground in front of car.



The car will chase the beam from controller, as you move the beam across the wall or ground.

When finished with your Zero Gravity™ Laser Wall Climber, remove vehicle from wall. Turn vehicle OFF. Turn the controller OFF.






**100%**

The Zero Gravity™ Laser Wall Climber has a working LED light on the top of the car.

**10%**

IMPORTANT: When the LED begins to blink, the battery is running low on power. Car should be removed from the wall immediately. Otherwise the vehicle may fall off the wall.

## TROUBLESHOOTING

| PROBLEM | SOLUTION |
|---|---|
| Vehicle will not run. | 1. Power switch is off. Turn on.<br>2. Controller battery is installed with incorrect polarity. Check (+) and (-) markings to make sure the battery is properly aligned.<br>3. Batteries are drained. Install new batteries. |
| Vehicle does not climb walls. | 1. Turn vehicle off for 50 seconds then restart.<br>2. Suction is jammed. Remove debris by blowing gently on the fan area located on the bottom of the vehicle. |
| Vehicle does not drive well. | 1. Make sure surface is clean of dirt/dust.<br>2. Make sure surface is neither too rough or too smooth.<br>3. Make sure surface is flat. |
| Vehicle slips climbing walls. | 1. Clean the tires with a damp rag.<br>2. Fold up the fabric skirts for a better seal prior to use. |
| Vehicle falls off the wall. | 1. Make sure to discharge and then charge again for 50 to 50 minutes.<br>2. Clean tires and make sure your wall and floor are also clean.<br>3. Check the fabric skirts for damage. If they have been pulled loose, tape them back on with flexible tape.<br>4. Make sure surface is flat. |

**NOTE:** If normal function of the product is disturbed or interrupted, strong electro-magnetic interference may be causing the issue. To reset product, turn it completely off, then turn it back on. If normal operation does not resume, move the product to another location and try again. To ensure normal performance, change the batteries, as low batteries may not allow full function.

FC This product complies with Part 15 of the FCC rules. Operation is subject to the following two conditions: (1) This device may not cause harmful interference, and (2) This device must accept any interference received, including interference that may cause undesirable operation. This equipment has been tested and found to comply with the limits for Class B digital devices pursuant to Part 15 of the FCC rules. These limits are designed to provide reasonable protection against harmful interference to radio communications. Because this toy generates, uses, and can radiate radio frequency energy, there can be no guarantee that interference will not occur. If this toy does cause interference to radio or television reception you can check this by turning the toy off and on while listening for the interference), one or more of the following measures may be useful. • Reorient or relocate the receiving antenna • increase the separation between the toy and the radio or the TV • Consult the dealer or an experienced TV-radio technician for help. **NOTE:** Changes, adjustments or modifications to this unit, including but not limited to: replacement of any transmitter component (crystal, semiconductor, etc.) could result in a violation of FCC rules under part 15 and/or 95 and must be expressly approved by Spin Master Ltd. or they could void the user's authority to operate the equipment.

CANADIAN Class B statement: This class B digital apparatus meets all the requirements of the Canadian Interference-Causing Equipment Regulations.

**BATTERY SAFETY INFORMATION:**
• Requires six AA 1.5-V alkaline batteries (not Included).
• Batteries are small objects.
• Replacement of batteries must be done by adults.
• Follow the polarity (+/-) diagram in the battery compartment.
• Promptly remove dead batteries from the toy.
• Dispose of used batteries properly.
• Remove batteries for prolonged storage
• DO NOT incinerate used batteries.
• DO NOT dispose of batteries in fire, as batteries may explode or leak.
• DO NOT mix old and new batteries or types of batteries (i.e. alkaline/standard).
• DO NOT use rechargeable batteries.
• DO NOT recharge non-rechargeable batteries.
• DO NOT short-circuit the supply terminals.

**Your Zero Gravity™ Laser is equipped with a Lithium Polymer battery.**
**SPECIAL LIPO BATTERY INSTRUCTIONS:**
• Never charge battery unattended.
• Charge battery in isolated area. Keep away from flammable materials.
• Do not expose to direct sunlight.
• There is a risk of the batteries exploding, overheating, or igniting. Do not disassemble, modify, heal, or short circuit the batteries. Do not place them in fires or leave them in hot places.
• Do not drop or subject to strong impacts.
• Do not allow the batteries to get wet.

• Only charge the batteries with the specified Spin Master™ battery charger.
• Only use the batteries in the device specified by Spin Master™.
• Carefully read the instruction guide, and use the batteries correctly.
• In the unlikely event of leakage or explosion use sand or a chemical fire extinguisher for the battery.
• Batteries must be recycled or disposed of properly.

⚠ **WARNING:**
Do not point the LED light at eyes. It is rare but possible for seizures to be triggered by light flashes. To reduce exposure to such potential, do not flash lights directly into eyes.

 Contains LiPo battery pack • Battery pack must be recycled or disposed of properly.<br>• If at any time in the future you should need to dispose of this product please note that Waste Electrical Products should NOT be disposed of with household waste. Please recycle where facilities exist. Check with your Local Authority or retailer for recycling advice. (Waste Electrical and Electronic Equipment Directive).

   

SPIN MASTER LTD., 450 FRONT STREET WEST, TORONTO, ON M5V 1B6 CANADA
Customer Care: 1-800-622-8339  Fax: 416-364-8005
Email: custservcanada@spinmaster.com
Spin Master Inc., PMB #10363, 300 International Drive, Suite 100, Williamsville, NY 14221, USA
Spin Master Toys Far East Limited, Rm #1113, 11/F, Chinachem Golden Plaza,
77 Mody Rd., Tsimshatsui E., Kowloon, HK

Imported by:
SPIN MASTER INTERNATIONAL S.A.R.L., 18 AVENUE PASTEUR L-2310, LUXEMBOURG
www.spinmaster.com



Air Hogs™, related trademarks & © 2011 Spin Master Ltd. All rights reserved. This product conforms to safety requirements of ASTM F963, EN71 & CHPA. • Please retain this information for future reference. • Please remove all packaging materials before giving to children. • An adult should periodically check this toy to ensure no damage or hazards are found. If so, remove from use. • Children should be supervised during play. • Keep addresses and phone numbers for future reference. • The item inside this package may vary from the photographs and/or illustrations.
MADE IN CHINA.

20039309_20039310_20039311_20039312  ISMI  English   REV 0
T44366_9008_20039009_GML_IS_R1

16

# EXHIBIT B

**Int. Cl.: 28**

**Prior U.S. Cls.: 22, 23, 38 and 50**

**Reg. No. 3,267,725**

## United States Patent and Trademark Office

Registered July 24, 2007

## TRADEMARK
### PRINCIPAL REGISTER

# WALL CLIMBER

SPIN MASTER LTD. (CANADA CORPORATION)
450 FRONT STREET WEST
TORONTO, ONTARIO, CANADA M5V 1B6

   FOR: TOY VEHICLES, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).

   THE MARK CONSISTS OF STANDARD CHAR-ACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

   PRIORITY CLAIMED UNDER SEC. 44(D) ON CANADA APPLICATION NO. 1,250,977, FILED 3-17-2005, REG. NO. TMA674608, DATED 10-11-2006, EX-PIRES 10-11-2021.

   SER. NO. 78-638,892, FILED 5-27-2005.

MARK T. MULLEN, EXAMINING ATTORNEY

1

**Int. Cl.: 28**

**Prior U.S. Cls.: 22, 23, 38 and 50**

**United States Patent and Trademark Office**

**Reg. No. 3,210,297**

Registered Feb. 20, 2007

## TRADEMARK
### PRINCIPAL REGISTER

# ZERO GRAVITY

SPIN MASTER LTD. (CANADA CORPORATION)
450 FRONT STREET WEST
TORONTO, ONTARIO, CANADA M5V 1B6

   FOR: TOY VEHICLES, IN CLASS 28 (U.S. CLS. 22, 23, 38 AND 50).

   THE MARK CONSISTS OF STANDARD CHAR-ACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

   PRIORITY CLAIMED UNDER SEC. 44(D) ON CANADA APPLICATION NO. 1,254,427, FILED 4-18-2005, REG. NO. TMA665,012, DATED 5-26-2006, EXPIRES 5-26-2021.

   SER. NO. 78-657,048, FILED 6-23-2005.

MICHAEL GAAFAR, EXAMINING ATTORNEY

2