# EXHIBIT A

COPY

## WALL RACER LICENSE AGREEMENT

This AGREEMENT ("AGREEMENT") made and entered into as of the 8th day of August, 2004 by and between Leonard Clark Jr., having its principal office at 128 Weldy Avenue Oreland, PA 19075 USA and H. Peter Greene, Jr., having its principal office at 12 Wards Way, Boyertown, PA 19512 USA (individually and/or collectively referred to as the "LICENSOR"), and Spin Master Ltd., having its principal office at 450 Front Street West, Toronto, Ontario M5V 1B6 Canada ("LICENSEE").

### WITNESSETH

WHEREAS, LICENSOR is the owner of all right, title and interest in and to "WALL RACER" as described in Exhibit A attached hereto and incorporated herein (the "ITEM"); and

WHEREAS, LICENSEE is in the business of manufacturing and selling toys and games; and

WHEREAS, LICENSOR wishes to grant and LICENSEE wishes to obtain the sole and exclusive rights to manufacture, market, promote, sell and distribute the ITEM on a worldwide basis;

NOW THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **GRANT OF RIGHTS.**
   1.1 Rights Granted: LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts, the sole and exclusive right and license during the Term and throughout the world (the "Territory"): to design, develop, make, have made, reproduce, modify, distribute, advertise, promote and sell and otherwise exploit the ITEM and all rights, information and materials pertinent thereto in any manner deemed appropriate or desirable by LICENSEE. The foregoing grant includes the right to appoint third parties to do any of the foregoing on LICENSEE's behalf, and also includes the sole and exclusive right and license: (a) to make, use, and sell the subject matter of any United States Patent or international patent issued to, owned or controlled by LICENSOR at any time during the Term of this Agreement, which may have claims covering the ITEM; and (b) to exploit by any means and in any and all respects the subject matter of any copyright, trademark, trade dress, mask work, confidential or proprietary information, trade secret, intellectual property of any kind or nature or other tangible or intangible right or manifestation in, of or associated with the ITEM, their design, manufacture or use including, but not limited to, knowhow pertaining thereto; and (c) to exploit in any way LICENSEE deems appropriate all associated subsidiary, ancillary and allied rights arising out of any of the foregoing.

   1.2.(a) Use of Rights Granted: LICENSOR grants, assigns, and transfers to LICENSEE the sole and exclusive right, privilege, and license to make, reproduce, modify, use, publicly perform, publicly display, transmit, broadcast, distribute, sell, and/or otherwise exploit or sublicense the ITEM and all rights referenced at 1.1 hereinabove on, as part of, and throughout all Platforms and Channels of Distribution (now known or hereafter developed) defined below, throughout the Territory in conjunction with any and all products and services of whatever kind or nature,

subject always to the royalty obligations of this Agreement, now known or hereafter developed, including but not limited to:

    (i)    all toys, including, without limitations, dolls, figures, plush, vehicles, playsets, construction sets, ride-ons, activity toys and miscellaneous toys; all games, including, without limitation, dice, card, board, action, strategy, electronic handheld and tabletop, interactive and miscellaneous games; all puzzles, miniatures, and craft and hobby items (including kits); all of any kind or description;

    (ii)    all other goods and services (hereinafter, "merchandise") of any kind or description, including but not limited to apparel, paper goods, books, back-to-school, and carrying cases, as may arise out of the ITEM or any associated, subsidiary, ancillary or allied rights;

    (iii)    entertainment products and services, including but not limited to television programming, motion pictures, television commercials, video games, computer programs and other interactive products, all of any kind or description; and

    (iv)    all methods and means of advertising or promoting said products and services.

(b)    Platforms and Channels of Distribution: All jobbers, retailers, and wholesale distributors, including but not limited to mass market merchandisers, toy stores, specialty stores, chains, supermarkets, drug stores, card and gift stores, catalogs, and catalog stores, as well as, direct marketing (including but not limited to direct mail, consumer solicitation, and door-to-door sales), and any network platform or analogous connected medium which multiple users can use simultaneously, including, without limitation, the Internet or intranets, by means of telephone lines, powerlines, cable television systems, optical fiber connections, Ethernet, cable, cellular phone technology, satellite technology, wireless broadcast, or other means, methods, or processes of transmission or distribution now known or hereafter developed shall be included, without limitation, as "Channels of Distribution". "Platforms" shall include, without limitation, self-contained units, units connected to audiovisual monitors, the delivery of content via any web site or connectivity on the Internet, all other functionality or capabilities of the Internet (e.g., e-mail, files, transfer protocol, etc.), other transmission media, online services (e.g., AOL, Prodigy, WebTV, MSN, etc.), transmission via satellite (e.g., Direct PC, Geocast), co-axial cable (e.g., Excite@Home), fiber optic cable, twisted pair cable, xDSL and all other means currently known or hereafter devised. Notwithstanding any territorial restrictions hereunder, it is understood that exploitation of the ITEM and associated intellectual property via all Platforms shall be unrestricted, as between the parties hereto.

1.3    Exclusivity and Licensor Improvements: LICENSOR agrees that, subject to section 30 herein below, during the Term, LICENSOR will not offer or license to any other party any property substantially similar to the ITEM or the rights therein described at 1.1 and/or 1.2 above, nor will LICENSOR utilize any such property itself in any manner which may conflict with the exclusive grant of rights hereunder. LICENSOR agrees that all additions, improvements, modifications, extensions and enhancements of the ITEM (including by way of example and not limitation a wall climbing vehicle using the venturi mechanism designed by the Licensor but not operated by radio control means) and all accessory items for use with the ITEM (but excluding battery packs and chargers) created, owned, or controlled by a party (collectively "Improvements") during the Term of this Agreement, as defined hereinbelow, shall be promptly

2

disclosed to LICENSEE as required at Section 3 regardless of their creation prior or subsequent to LICENSOR's presentation of the ITEM to LICENSEE shall be deemed to be included within the scope of those rights granted by LICENSOR to LICENSEE hereunder, and, subject to LICENSOR's compliance with this paragraph, shall be deemed included in the definition of "ITEM" for all purposes of this Agreement.

2. **DISCLOSURE OF TECHNOLOGY.** Immediately upon execution of this Agreement, LICENSOR shall disclose and make available to LICENSEE all the TECHNOLOGY pertaining to the ITEM not previously disclosed to LICENSEE. "TECHNOLOGY" means all LICENSOR's technology relating to the ITEM including without limitation the intellectual property rights and any and all information and prototypes relating to the development, manufacture, advertisement, sale, distribution and use of the ITEM, regardless of form. Without limiting the foregoing, TECHNOLOGY shall include all documented research, developmental and demonstration work, prototypes, drawings, specifications, designs, technical data, formulas, advertisements, promotional materials, manufacturing instructions and, if available, any tools, moulds, dies, and/or jigs required to manufacture the ITEM as well as the best mode of invention of the ITEM.

3. **CONTINUING DISCLOSURE.** Throughout the Term, LICENSOR shall keep LICENSEE informed promptly of all Licensor Improvements and of all additions, improvements, further developments or enhancements to the TECHNOLOGY. During and after the Term of this Agreement, all improvements, additions, modifications, extensions, enhancements and accessory items to the ITEM and/or the TECHNOLOGY made by or for the LICENSEE by LICENSEE itself and third parties (collectively "Licensee Improvements") shall not be defined as ITEM but shall be and remain the sole and exclusive property of the LICENSEE and, if so desired, LICENSEE shall have the right to exploit in any fashion it deems advisable and to make patent applications for such Licensee Improvements and all proceeds of exploitation thereof and any patent and other intellectual property rights therein shall be and remain the property of LICENSEE and may be subject to any use whatsoever but subject always to the rights of LICENSOR and this Agreement.

4. **PAYMENT.** In full and complete consideration for the rights granted to LICENSEE under this Agreement, LICENSEE agrees to pay LICENSOR the following:

**REDACTED**

**REDACTED**

**REDACTED**

5. **ROYALTY REPORTS.** LICENSEE shall, within forty-five (45) days following the end of each calendar quarter, starting with the quarter in which sales of the ITEM commence, submit to LICENSOR a report covering the sales of the ITEM during the preceding quarter, and LICENSEE shall therewith transmit to LICENSOR payment of the amount due under Paragraph 4 hereof, if applicable, less any applicable withholding taxes. Notwithstanding the foregoing, all amounts payable on International Net Receipts and Consumer Net Receipts resulting from sales of the ITEM in any country outside Canada or the United States (a "Foreign Country") shall be due to LICENSOR within sixty (60) days following the end of the calendar quarter in which such International Net Receipts or Consumer Net Receipts are received by LICENSEE.

6. **AUDITS.** LICENSEE agrees to keep, for a minimum of two (2) years after the transactions recorded therein, full and accurate books of account, records, data and memoranda respecting the manufacture and sales by LICENSEE of the ITEM and Net Receipts, International Net Receipts and Consumer Net Receipts resulting therefrom, and amounts paid to LICENSEE by sublicensees of the ITEM, in sufficient detail to enable the payments hereunder to LICENSOR to be determined, and LICENSEE further gives LICENSOR the right, at its own expense, to examine said books and records on prior written notice of at least ten (10) business days, insofar as they concern the ITEM and not more often than once in any calendar year, for the purpose of verifying the reports provided for in this Agreement. In the event that LICENSOR examines the records, documents and materials in the possession or under the control of LICENSEE with respect to the subject matter, such examination shall be conducted by an independent licensed public auditor selected by LICENSOR and approved by LICENSEE (such approval not to be unreasonably withheld) and shall be conducted in such manner as to not unduly interfere with the business of LICENSEE. LICENSEE may rely upon reports and payments by sublicensees and shall have no obligation to audit such payments or reports nor to obtain underlying records of sublicensees for inspection by LICENSOR. Neither LICENSOR nor LICENSOR's representatives shall disclose to any other person, firm or corporation nor to any public or governmental entity, any information acquired as a result of any such examination; provided, however, that nothing herein contained shall be construed to prevent LICENSOR and/or its duly authorized representatives from testifying in any court of competent jurisdiction with respect to the information obtained as a result of such examination, in any action instituted to enforce the rights of LICENSOR under the terms of the Agreement; provided further, however, that no such testimony or other disclosure of subject information shall be made prior to imposition of a Licensee-approved protective order with respect to all such information. Interest on all unpaid royalty or other payments due and not paid under this Agreement shall bear interest from the original due date until paid in full annualized at the prime rate published from time to time by the Morgan Chase Bank in New York City, New York. In the event of unreported royalty amounts determined in an audit, LICENSEE shall pay the actual expenses of LICENSOR's audit provided such unreported royalties amount to more than 5% of the total amount owed for the period audited. All royalty statements and reports shall be presumed correct until subjected to audit and not subject

5

to challenge past the second anniversary of the date on which each is scheduled to have been rendered pursuant to this Agreement.

7. **TAXES.** LICENSOR shall be solely responsible for notifying LICENSEE of any applicable Goods and Services Tax ("GST") or other tax for which LICENSOR is registered, failing which LICENSOR agrees to indemnify LICENSEE against any and all claims for payment of same. All payments to LICENSOR hereunder may be subject to applicable withholding taxes. In the event that LICENSOR's circumstances at the date of this Agreement exempt payments hereunder from GST or other tax or withholding, but such circumstances and exemptions subsequently change, LICENSOR shall immediately notify LICENSEE and its failure to do so shall cause the indemnity obligation set forth hereinabove to apply to any subsequent claims therefor. Nothing in this Agreement shall be deemed to make LICENSOR responsible for the obligations of LICENSEE for VAT, franchise, income or other similar taxes.

8. **SUBLICENSES.**

    (a) LICENSEE may grant sublicenses of the ITEM (e.g. the right to sell the ITEM as a toy to third parties) in the Licensed Territory to arms length third parties, upon such terms and conditions as are determined by LICENSEE in its sole discretion; provided, however, that in the event that LICENSEE does so grant sublicenses of the ITEM, LICENSEE shall pay to LICENSOR one half of all advances, guarantee payments, royalties received by it from any such sublicense or grant, net of any third party royalty obligations and net of all LICENSEE's direct costs of procuring, entering and administering sublicenses including, without limitation, agent fees, advertising costs and applicable taxes and other costs and expenses but without any deduction for overhead or G&A or similar expenses. In the event that the royalty rate specified at Section 4.2 is reduced pursuant to one or more of the conditions set forth therein, then the above referenced portion payable to LICENSOR of sublicense royalties shall be reduced ratably.

    (b) In the event that LICENSEE elects to enforce its rights against any sub-licensee or other third party who fails to adhere to the non-financial terms and conditions of a sublicense agreement, LICENSEE shall deduct all resulting costs and expenses "off the top" of any recovery of royalties payable to LICENSEE by the sublicensee prior to computing LICENSOR's share as set forth above. LICENSEE shall have no obligation to undertake any such enforcement activity.

    (c) For sales outside the United States, LICENSEE will make payment to LICENSOR based upon the exchange rate in effect on the day the royalty is due to be paid to LICENSEE by the pertinent sublicensee in the Foreign Territory. If the payment of royalties for sales in any country of the Territory is blocked or subject to restrictions by governmental authorities, such royalties either may be held in the blocking or restricting country (if permitted by local regulations) or may be removed from such country and paid to LICENSOR, subject to whatever restrictions, limitations and/or taxes which may be imposed by the government of such country. In no event shall LICENSEE be responsible to protect the value of sums against currency fluctuation, effects of inflation, or other economic or monetary adjustment.

9. **INTRODUCTION TO TRADE.** In the event that for any other reason, other than the occurrence of a *force majeure* event, LICENSEE fails to introduce the ITEM to the trade prior to May, 2006, this Agreement shall terminate without further notice.

6

10. **MARKET.** LICENSOR acknowledges that LICENSEE has made no warranty or representation regarding the potential size of the market for the ITEM or the royalties or other revenues that will be paid to LICENSOR pursuant to this Agreement. LICENSEE shall have the sole and unfettered discretion to determine the manner, if any, in which the ITEM is developed, manufactured, sold, advertised, distributed, promoted, used or exploited. Without limiting the generality of the foregoing, the LICENSEE shall have no duty to manufacture and/or sell the ITEM or to otherwise exploit the ITEM.

11. **PATENTS AND INDUSTRIAL DESIGN APPLICATIONS.**

    (a) LICENSOR agrees to use its best efforts and to bear the expense of obtaining patent protection that will adequately protect the ITEM from competition in the United States (including its territories and possessions) and Canada. LICENSEE may assist LICENSOR as LICENSOR may request in the preparation and filing of any patent or industrial design application but, in such event, LICENSOR agrees to cooperate and to reimburse LICENSEE for all costs and attorneys' fees associated with the filing.

    (b) If LICENSEE considers it necessary or desirable to obtain patent protection for the ITEM in a Foreign Country, it shall notify LICENSOR of that decision. If obtaining the patent protection in the Foreign Country is not barred by prior use or publication, LICENSEE may file such patent or industrial design application. LICENSEE shall bear all of the expenses of obtaining patent protection in each Foreign Country; LICENSOR may, at its option upon the termination or expiration of this Agreement for any reason, reimburse LICENSEE for a *pro rata* portion of such costs and expenses, including, without limitation, all attorneys' fees and filing costs, upon presentation to LICENSOR of LICENSEE's invoices for such costs in exchange for an assignment to LICENSOR of such patent(s).

    (c) Each party agrees to keep the other fully advised and informed of the progress of any patent or industrial design applications, and to provide copies of said applications and office actions and amendments thereto as soon as such are available.

12. **TRADEMARK AND COPYRIGHT APPLICATIONS.** If they are not already applied for or registered and if registrable, LICENSEE may, at its sole discretion, apply to register the design patents, industrial designs, copyrights and trade marks for or used with the ITEM in LICENSEE'S name and, if required, to record LICENSEE or LICENSEE'S distributor as registered user of same for the ITEM in any such countries. All costs pertaining to such applications, registrations and renewals shall be borne by LICENSEE. Notwithstanding any termination of this Agreement, LICENSOR expressly acknowledges that any such design patents, industrial designs, trade marks and copyrights shall be owned exclusively by LICENSEE and may be used in connection with the ITEM and/or any other products at anytime during or after the Term of this Agreement without obligation.

13. **TERM.** This Agreement shall commence on the date first listed above and shall continue until such time when LICENSEE and all its affiliates and sublicensees stop selling the ITEM for at least twelve (12) consecutive months, unless sooner terminated in accordance with the provisions hereof.

14. **TERMINATION.** This Agreement may be terminated by either party upon written notice to the other, in the event that:

7

(a) Subject to applicable bankruptcy laws, a voluntary petition in bankruptcy is filed by the other party or an involuntary petition in bankruptcy is filed against the other party and is not dismissed within forty-five (45) days thereafter, or if a receiver or trustee for any of the property of the other party is appointed and is not vacated within forty-five (45) days thereafter, or if the other party shall be adjudged insolvent, or if an assignment shall be made of the other party's property for the benefit of creditors; or

(b) In case either party fails to perform under or commits a material breach of any of the several covenants and conditions herein contained, the other party shall notify such party in writing of such failure or default and such party shall then have the right to remedy such failure or default by complying with the terms of this Agreement, and thereby making the notice null and void and of no effect. If the breaching party has not instituted a remedy or is not in the process of instituting a remedy within sixty (60) days of receipt of such notice, the aggrieved party may terminate this Agreement immediately by a further notice in writing; provided, however, that a termination by LICENSEE under this subparagraph shall affect only LICENSOR's rights and LICENSEE's obligations under this Agreement but shall not affect LICENSEE's rights including, without limitation, its right to exploit the ITEM, and provided further that a breach by LICENSOR that threatens to or in fact affects LICENSEE's exclusivity to the ITEM shall immediately and irreparably harm LICENSEE, shall be without adequate remedy in damages and shall entitle LICENSEE to seek temporary and permanent injunctive relief and such additional remedy as may be determined by any court of competent jurisdiction. In the event of such material breach by LICENSOR, it shall immediately upon demand by LICENSEE refund any portion of any Advance which may have been paid hereunder and which shall not have been credited against royalties.

(c) LICENSEE will further have the right to terminate this Agreement at any time and for any reason or for no reason upon giving LICENSOR a ninety (90) day notice, in which event all rights to the ITEM licensed by LICENSOR herein will revert to LICENSOR.

## 15. RIGHTS ON TERMINATION.

(a) Upon termination of this Agreement, LICENSEE shall have the right to dispose of its existing inventory, whether completed or in the process of manufacture, for a period of six (6) months after termination, subject to the payment of royalties as set out herein, and may do so as Close-out Sales. Any leftover inventory at the end of this sell-off period may be purchased by LICENSOR who shall pay LICENSEE for such inventory at LICENSEE'S cost, including the cost of shipping and delivery to LICENSOR.

(b) Notwithstanding the termination of this Agreement by LICENSOR, any sublicenses previously granted by LICENSEE pursuant hereto shall remain in full force and effect until terminated or expired in accordance with the provisions thereof; LICENSEE shall promptly take all requisite steps to effect assignments of such agreements to LICENSOR.

(c) Upon termination, LICENSEE shall have the right to offset any amounts owing to it, from the LICENSOR, against amounts otherwise owing by it to the LICENSOR.

(d) Any termination hereunder shall be without prejudice to any other rights one party may have against the other in law or equity.

8

(e) Any termination on account of LICENSEE's failure to introduce the ITEM pursuant to Section 9 or cessation of sales pursuant to Section 13 shall not be considered termination for breach, and, except as provided otherwise herein, LICENSEE's sole obligation to LICENSOR shall be to have made payments pursuant to Sections 4 and 8 as applicable for ITEMS actually sold and receipts actually received.

16. **REPRESENTATIONS AND WARRANTIES.** LICENSOR hereby expressly represents and warrants as follows:

    (a) That it is the sole and exclusive owner of the ITEM and all rights pertaining thereto, free and clear of any claim, security interest, pledge, option, charge, encumbrance or moral rights of others;

    (b) That it has the sole right to grant this license and that it has granted no other license of the ITEM in the Territory;

    (c) That it is not engaged in any litigation or conflict of any nature whatsoever involving the ITEM and no claim has been made or threatened in respect of the ITEM;

    (d) That the license granted herein does not conflict with LICENSOR'S agreement with any third party and, to the best of its knowledge and belief, does not infringe on the rights of any third party;

    (e) No disclosure of the ITEM has been made to any entity other than subject to an obligation of confidentiality to LICENSOR; and no disclosure of this Agreement or any content hereof shall be made to any entity by LICENSOR;

    (f) That it has not granted and that it will not except as permitted herein, grant to any other person, firm, association, or corporation a license or right to manufacture or sell in the Licensed Territory any item similar to or competitive with the ITEM whether or not covered by any patent on the ITEM;

    (g) To the extent that this Agreement includes the assignment of any trademarks or service marks, the quality of the goods or services to which the marks relate can be effectively controlled by the registered owner thereof; and

    (h) LICENSOR'S intellectual property rights are in full force and effect and have not been used or enforced or failed to be used or enforced in any manner that would result in the abandonment, cancellation or unenforceability of any such rights.

17. **INDEMNITY.**

    (a) LICENSOR agrees to indemnify LICENSEE, its directors, officers, affiliates, subsidiaries, employees, agents and customers against any and all losses, costs, expenses damages. judgments and claims (including reasonable attorneys' fees) arising out breach of any of LICENSOR's covenants, representations and warranties contained herein (including, without limitation, its covenant of non-competition contained in Section 30 hereof), and/or any claims, demands, actions, suits or prosecutions that may be instituted against LICENSEE by reason of any claim by any other person, firm or corporation of either:

    (i)    a superior right in and to the ITEM or any feature thereof based on the design submitted by LICENSOR;

    (ii)    any patent infringement arising out of the distribution and sale of the ITEM by LICENSEE based on the design submitted by LICENSOR; or

    (iii)    infringement of trade secrets or the like, arising out of LICENSEE's sale of the ITEM, to the extent that such claim is attributable to LICENSOR's actions.

(b) After receiving notice of an indemnified claim, LICENSEE will not be required to pay any royalties or other payments pursuant to this Agreement until the favorable resolution and/or settlement of any such claim, but shall instead pay same into an interest-bearing account. If no breach of any of LICENSOR's warranties is found as a final result of such claim, the payment of royalties earned (as well as all interest actually accrued) will be resumed after deduction of LICENSEE's reasonable attorneys' fees, expenses and any losses incurred in connection with the claim. If a breach by LICENSOR of any of its warranties hereunder is evident as a result of such claim or its disposition, then all of LICENSOR's rights and LICENSEE's obligations hereunder, including the obligation to pay royalties, will terminate, and any remaining right in the ITEM shall be transferred to and vest in LICENSEE; provided further that if the royalties retained during the pendency of the claim shall not fully recompense LICENSEE pursuant to this paragraph, then LICENSOR shall, within thirty (30) days of LICENSEE's written request, provide such additional funds to LICENSEE as may be necessary to fulfill any deficiency. Defense of any claim shall be controlled by LICENSEE, and LICENSOR agrees to cooperate fully in such defense if requested. LICENSOR agrees that, if in LICENSEE's judgment, such claim can be compromised or settled by any payment of monies or otherwise by LICENSEE, then LICENSEE will have full right to compromise or settle such claim and to deduct the amount of any payment made from payments then due or to become due LICENSOR hereunder.

(c) LICENSEE agrees to indemnify and save harmless LICENSOR against any and all losses, costs, expenses damages. judgments and claims (including reasonable attorneys' fees) resulting from all claims for personal injury or property damage and similar or related claims based on the use of the ITEM as produced and sold by LICENSEE, its subsidiaries, affiliates and sublicensees, except to the extent that the loss, damage or injury resulted from an inherent feature of the ITEM as designed by LICENSOR and presented to the LICENSEE.

(d) Except in accordance with the indemnity obligation of this Agreement, neither party shall be liable to the other for indirect, punitive, special, incidental or consequential damages, including lost profits.

## 18. THIRD PARTY INFRINGEMENTS.

(a) The parties to this Agreement shall notify each other of any infringement or suspected infringement by any third party of the ITEM or any trade marks, trade names, patents, industrial designs, copyright or other right associated therewith of which they become aware.

(b) In the event of infringement of any patent that may be issued on the ITEM, LICENSEE shall have the sole option to elect to prosecute or not prosecute a suit for infringement. If

LICENSEE elects to prosecute such suit, it may select legal counsel and shall pay all legal fees and costs of prosecution, and any recovery, whether by judgment, settlement or otherwise, shall belong exclusively to LICENSEE, provided that any recovery for lost profits (net of actual expenses incurred by LICENSEE in connection with prosecuting the claim) shall be subject to the full royalty rate of five percent (5%) payable to LICENSOR pursuant to section 4.2 hereof. If LICENSEE elects not to prosecute any suit for infringement of patents covering the ITEM, LICENSOR may do so after written notice to LICENSEE of that invention. LICENSOR may then select legal counsel reasonably acceptable to LICENSEE, and shall bear all the legal fees and costs subject to reimbursement therefore from any recovery in the suit. The balance of any recovery shall be shared equally by the parties. The parties agree to cooperate fully and in good faith in pursuing any such infringement claims.

(c) All occurrences of third-party infringement of trademark, copyright, industrial design or design patent shall be subject to action or inaction at the sole discretion of LICENSEE, and LICENSOR shall provide cooperation to LICENSEE reasonably and in good faith in taking any action, as LICENSEE may elect. All net recoveries (after litigation expenses) from any such action undertaken by LICENSEE shall be subject to the full royalty rate of five percent (5%) payable to LICENSOR pursuant to section 4.2 hereof. The balance of any such recovery shall belong to LICENSEE.

19. **SAMPLES.** LICENSEE shall furnish LICENSOR with six (6) samples of the each ITEM, free of charge, promptly following commencement of production thereof. Should LICENSOR require additional samples of the ITEM for any reason, it may purchase same from LICENSEE at LICENSEE's landed cost (inclusive of warehouse and storage costs).

20. **LEGAL NOTICES.** All ITEMS, packaging and advertising material shall conform to the local law requirements in the Licensed Territory and shall bear such inscriptions, trademarks, and other appropriate notices as LICENSEE may select.

21. **OWNERSHIP OF TRADEMARKS.** Trademarks, trade names, slogans, designs, copyrights, methods and all other intellectual property rights used in connection with the manufacture, sale or advertisement of the ITEM (except as expressly protected by LICENSOR's patent rights) shall, notwithstanding termination, be and remain the sole property of LICENSEE.

22. **INSURANCE.** LICENSEE shall, throughout the term of this Agreement, obtain and maintain at its own expense, with reputable carriers standard and customary types and limits of products and other product liability insurance coverage, listing LICENSOR as additional insured. Such policy shall provide protection against any and all claims of property damage or bodily injury due to defects or failure to perform, alleged or otherwise, of the ITEM or any use of the ITEM.

23. **ASSIGNMENT OF RIGHTS.**

(a) LICENSEE shall have the right to assign the rights granted by LICENSOR hereunder without the consent of the LICENSOR. LICENSOR shall not assign this Agreement without the consent of the LICENSEE, which consent may be withheld by the LICENSEE in its sole discretion.

11

(b) Except as specifically provided otherwise herein, no assignment pursuant to this section shall create any additional advance or guaranteed royalty or other obligation of any kind as between the parties hereto.

24. **FORCE MAJEURE.** It is understood and agreed that in the event an act of government, war, fire, flood, an Act of God or labor trouble in the factory of LICENSEE, or in the factory of those manufacturing parts necessary for the manufacture of the ITEM prevents the performance by LICENSEE of the provisions of this Agreement, then such nonperformance by LICENSEE shall not be considered a breach of this Agreement and shall not entitle the LICENSOR to terminate this Agreement and such nonperformance shall be excused while, but no longer than, the conditions described herein prevail. Provided that in the event that such event endures for more than two (2) months, then LICENSOR may at its option terminate this Agreement without further obligation to LICENSEE.

25. **NOTICES.** All notices wherever required in this Agreement shall be in writing and sent by facsimile, certified mail or overnight delivery and shall be deemed given when sent or mailed.

26. **SEVERABILITY.** If any provisions of this Agreement are for any reason declared to be invalid, the validity of the remaining provisions shall not be affected thereby.

27. **ASSIGNS and SUCCESSORS.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

28. **LAW and JURISDICTION.** This Agreement and each and every one of its provisions shall be interpreted under the laws of the Province of Ontario, Canada and the parties irrevocably consent to the jurisdiction of the courts of the Province of Ontario, Canada.

29. **ENTIRE AGREEMENT.** This Agreement represents and expresses the entire agreement of the parties and supersedes all prior agreements, representations and understandings (written or verbal) between the parties concerning the subject matter hereof. An amendment or modification of a term or condition of this Agreement must be in writing and duly executed by both parties. Except as otherwise provided herein, the terms and conditions of the following sections of this Agreement shall survive expiration or termination: 8, 12, 15 through 18, 21, 26, 28, 31 and 32.

30. **NON-COMPETITION.**

(i) Subject to Subsection 30(ii) set out below, LICENSOR agrees that neither LICENSOR nor any entity or person receiving benefits from LICENSOR will manufacture or market or license or otherwise grant or exploit rights for manufacture or marketing for sale any product that competes, directly with the ITEM in the Licensed Territory. LICENSOR agrees that the remedy at law for any breach of this non-competition covenant would be inadequate and that LICENSEE would be entitled to injunctive relief in the case of any such breach. LICENSOR further acknowledges that LICENSEE is a manufacturer of a diverse line of products and that many products contain similar elements. Mere similarities between the ITEM and other products manufactured by the LICENSEE shall not trigger any obligations to LICENSOR under this Agreement. Such other products may, for example, utilize similar play patterns, packaging, advertising and promotional methods to ITEM, and LICENSEE shall have no obligation therefor to LICENSOR except as set forth in this paragraph.

(ii) Notwithstanding the foregoing, LICENSEE acknowledges that LICENSOR has invented a similar toy product utilizing a "radial" venturi system which has the ability to also scale walls (the "Similar Product"). Licensor agrees not to sell or license the Similar Product so long as (a) LICENSEE introduces the ITEM to the Trade on or before February, 2006, and (b) LICENSEE pays to Licensor ONE HUNDRED THOUSAND DOLLARS (USD $ 100,000.00) per annum in minimum royalties on sales of the ITEM starting with sales in calendar year 2006 (the "Minimum Royalty"). If Licensee fails to do either of the foregoing then Licensor is free to show the Similar Product to third parties. It is specifically agreed that in order to continue this Agreement and to enjoy the benefit of the right of first refusal for the Similar Product, Licensee may in any year elect to pay the deficiency/difference between in royalties actually earned and paid and the Minimum Royalty, and upon such payment this License Agreement will continue and Licensor will continue to reserve the Similar Product from the Trade."

(iii) In the event this Agreement permits LICENSOR to solicit a third party offer of sale or license for the Similar Product, and LICENSOR notifies LICENSEE that such offer has been received, then LICENSEE may exercise its right of first refusal by (a) replying within ten (10) days of receipt of such notice from LICENSOR that LICENSEE will match such offer, and (b) by proceeding to close on the completion of such license or sale as soon as practicably possible thereafter, but in any event no longer than thirty (30) days thereafter. In the event of failure by LICENSEE to give such timely notice or complete the transaction timely, all rights to the Similar Product shall revert to LICENSOR immediately and without reservation.

31. **CONFIDENTIALITY.** LICENSOR acknowledges that, during the course of its dealing with the LICENSEE, it may obtain trade secrets, proprietary or other confidential information concerning the business or affairs of the LICENSEE ("Protected Information"). During the Term of this Agreement and at all times thereafter, LICENSOR agrees that it shall hold in confidence, and shall not disclose or permit the disclosure of, the Protected Information, in whole or in part, regardless of the form in which it is received, other than to its directors, officers, employees, agents or contracting third parties having a need for such disclosure consistent with the purpose of this Agreement. LICENSEE agrees that this obligation of confidentiality shall not extend to Protected Information which:

(a) At the time of disclosure is in the public domain, or which thereafter becomes part of the public domain through no fault of or participation by the LICENSOR or those in active concert or participation with it; or

(b) LICENSOR can prove was in the possession of the receiving party prior to the disclosure thereof by the LICENSOR and was not previously obtained by it, directly or indirectly, from the LICENSOR.

LICENSOR acknowledges that: (i) the Protected Information is commercially and competitively valuable to the LICENSEE; and (ii) the unauthorized use or disclosure of the Protected Information would cause irreparable harm to the LICENSEE.

LICENSOR agrees that the LICENSOR shall notify the LICENSEE immediately upon discovery of any unauthorized use or disclosure of the Protected Information, and shall fully cooperate with the LICENSEE to assist the LICENSEE to regain possession of the Protected Information and prevent the further unauthorized use or disclosure of Protected Information.

LICENSOR agrees that it and its directors, officers, employees, agents and any third party supplier it engages, who will have access to the Confidential Information, shall be under a similar obligation to abide by the secrecy obligations imposed pursuant to this section 31.

32. **FURTHER ASSURANCES.** The parties agree to do all things and to execute all documents reasonably necessary to give full force and effect to this Agreement.

33. **DISPUTE RESOLUTION.** In the event of any disagreement or dispute between the parties arising under this Agreement, then such dispute or disagreement shall be resolved as follows:

A party shall give to the other party a written notice describing such dispute or disagreement. Then the parties shall endeavor to resolve such dispute or disagreement by negotiation between the parties through authorized representatives, each of whom shall have the authority to resolve the dispute or disagreement.
In the event that the dispute or disagreement has not been resolved between the parties after a period of twenty (20) days from the receipt of such notice, then the parties shall engage the services of a qualified independent third party as mediator to assist them in their negotiations. The cost of such services shall be shared equally by the parties.
In the event that the parties are unable to resolve the dispute or disagreement with the assistance of a mediator after twenty (20) days then the dispute or disagreement shall be submitted to final and binding arbitration before a single arbitrator sitting at Toronto Canada under the rules of the American Arbitration Association then in effect. The prevailing party in such proceeding shall be entitled to recover its costs and expenses, including without limitation its reasonable attorney's fees, from the other party.
Notwithstanding the foregoing, nothing shall prevent a party from seeking equitable relief in the nature of preliminary or permanent injunctive relief from a court of competent jurisdiction in the event of the need to protect confidential information or proprietary intellectual property, to preserve the *status quo ante*, or prevent irreparable harm.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**LEONARD R. CLARK, JR.**

By: _____

Name: Leonard R. Clark, Jr.

Title: _____

**SPIN MASTER LTD.**

By: _____

Name: ~~Ben Varadi~~ Anton Rabie

Title: ~~Executive Vice~~ President

**H. PETER GREENE, JR.**

By: _____

Name: H. Peter Greene, Jr.

Title: _____

15

## EXHIBIT A

      For the purposes of the Wall Racer License Agreement to which this Exhibit is appended, "ITEM" shall mean and be limited to a vehicle that is operated by radio control means and has the ability to climb vertical and/or overhead surfaces without the need for track and using a venture mechanism designed by and demonstrated by LICENSOR. See attached page 2 drawing which is part of this Exhibit A.



WallRacer - Venturi Downforce System - Exhibit A

Invented & Developed by Leonard R. Clark & H. Peter Greene